FILED
2017 Aug-08  PM 01:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| BRETT WINGO | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. _____ |
| | ) | |
| THE SOUTHERN COMPANY, | ) | |
| SOUTHERN COMPANY | ) | |
| SERVICES, INC. and | ) | |
| THOMAS A. FANNING, | ) | Jury Trial Demanded |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR MONETARY RELIEF AND JURY DEMAND

COMES NOW, Plaintiff BRETT WINGO ("Mr. Wingo") and brings this Complaint against Defendants THE SOUTHERN COMPANY, SOUTHERN COMPANY SERVICES, INC. ("together, "the Southern Company", "Southern Company" or "the Company"); and THOMAS FANNING ("Defendant Fanning") (all together, "the Southern Company Defendants" or "the Defendants"), and states as follows.

## Preliminary Statement and Introduction

1

1.     Prolonged concealment of the truth can impose devastating consequences. The Southern Company Defendants have proven this to be true. In a continuing effort to capture hundreds of millions of dollars of taxpayer subsidies; inflate short-term stock prices; ensure continued payment of unjustifiable executive compensation packages; and impose billions of dollars in higher electricity costs— for captive consumers in their monopoly utility market—for decades to come. Southern Company management again and again offered false promises about the feasibility, schedule, and safety of their Kemper County, Mississippi power plant (the "Kemper Project") – a "first of a kind" power plant that promised to deliver cleaner, more affordable electricity while using proprietary "clean coal" and integrated gasification combined cycle (IGCC) technology.   When the Kemper Project was approved in 2010, there was one basic requirement in order to secure federal tax incentives: a Commercial Operations Date ("COD") by May 2014. Throughout the Kemper Project's troubled history, each schedule slip and cost increase was always blamed on "unknowable unknowns", things allegedly beyond Defendants' control.   But the facts now revealed confirm that not only were these developments both knowable and known, but that efforts to raise the truth were actively suppressed and repeatedly punished.     Years later, the Kemper Project stands as a monument to the consequences of concealment of the truth, and what too

often happens to those who step forward to reveal the truth: they are retaliated against, rather than embraced and protected.

2.     The consequences (so far) of the Southern Company Defendants' refusal to "come clean" about their poorly planned and implemented "clean coal" Kemper Project include the loss of thousands of jobs; the endangerment of hundreds of workers in the plant and families living near the inadequately inspected plant; billions in shareholder losses; hundreds of millions more in wasted government subsidies; and the derailing of the exemplary career of Brett Wingo.  Mr. Wingo, an Engineer and Project Manager for the Kemper Project, consistently told the truth to the Southern Company Defendants, including directly to Defendant Fanning, about the many issues surrounding the Kemper Project.   Although the legitimacy of Mr. Wingo's reporting of these concerns to the Southern Company Defendants, and the "callous and reckless disregard" in retaliating against him, have already been vindicated by both the passage of time and findings from an official federal proceeding under Section 806 of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, the full consequences of the Southern Company Defendants' actions against Mr. Wingo, his family, and his life remain serious and unremedied.

3.     Fortunately, the Sarbanes-Oxley Act, 18 U.S.C. § 1514A ("SOX"), the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 15 U.S.C. §

78u-6(h)(1)(A), and state laws protecting against retaliation against employees such as Mr. Wingo were enacted to protect the community and investing public against corporate misconduct, as well as return at least some of the consequences back upon those such as the Southern Company Defendants.

4.    When Mr. Wingo became aware of the Southern Company Defendants' falsified schedule to support the Kemper Project's unrealistic and unachievable COD, he followed the chain of command and expected that the Southern Company Defendants, including Defendant Fanning, would take responsibility for fixing the documented concerns. When Mr. Wingo further reported that the managers of the Kemper Project omitted basic required mechanical safety inspections, creating a massive risk both to the employees and surrounding communities, Mr. Wingo also expected the Southern Company Defendants would remedy the deficiencies and not simply ignore them too.

5.    In response, however, managers at Southern Company first attempted to push Mr. Wingo into willful blindness, a condition that Mr. Wingo ultimately found had completely infected the Southern Company Defendants. Manager after manager for Southern Company warned Mr. Wingo to drop his reporting of issues, threatening that he was "digging a hole" for his career, and that he simply needed to let others "handle" the issues he had raised.  Yet it was apparent to Mr. Wingo that

the individuals selected to follow up on what he reported were either complicit in the unlawful activity itself, or too fearful to take meaningful corrective action.

6.      In the face of these initial efforts to push him into willful blindness, Mr. Wingo instead continued to act to protect the physical safety of workers at the plant and surrounding communities and the financial safety of investors. After exhausting all internal options, including documenting and reporting ongoing fraud to the Compliance Office, CEO, and COO at Southern Company, Mr. Wingo submitted an official "tip" report to the Securities and Exchange Commission on October 28, 2014. In that tip, Mr. Wingo reported his honest belief that Defendant Southern Company had engaged in fraudulent, material acts and practices in the course of business in violation of Rule 10b-5. More specifically, Mr. Wingo reported that Southern Company committed fraud by misrepresenting the plant's construction schedule and construction milestones to federal regulators and investors. Similarly, Mr. Wingo also reported that Southern Company's managers would continue their material misrepresentations by declaring a successful "major milestone" called "First Fire" of the plant in the coming months, even when no such major operational milestone was actually accomplished. On February 15, 2015, as required by law, Mr. Wingo also filed an administrative complaint with the U.S. Occupational Safety and Health Administration (OSHA) alleging retaliation in violation of SOX.

7.    As Mr. Wingo continued to work to protect investors, fellow employees, and the community against the impending consequences of Defendants' willful blindness and deception, Southern Company responded by terminating Mr. Wingo, effective February 15, 2016. Implicitly admitting the intended goal of suppressing his truthful reporting, Southern Company managers fired Mr. Wingo based on his supposed lack of trustworthiness in legally protected reporting to the U.S. Securities and Exchange Commission and the U.S. Department of Labor. By terminating Mr. Wingo, the Southern Company violated the Sarbanes-Oxley Act, the Dodd-Frank Act, and Mississippi Public Policy, all intended to protect honest reporters of corporate misconduct.

8.    The professional and personal consequences from the Defendants' continued retaliatory conduct aimed at Mr. Wingo are ongoing and will likely never be able to be fully compensated.  On February 27, 2017, after lengthy review of the evidence, OSHA issued an Order fully confirming that the Southern Company broke the law and violated whistleblower protections. OSHA also ordered the Southern Company to immediately reinstate Mr. Wingo, but the Southern Company simply refused to do so, even though the Order is not stayed or otherwise able to be legally ignored.

9.      For Southern Company investors, taxpayers and utility consumers alike, the consequences of suppressing the truth continue to pile up as well. As announced during the most recent August 2017 earnings call for investors with Defendant Fanning and other Southern Company managers, the Company has already incurred estimated shareholder losses of more than $6 billion from the Kemper Project.  Moreover, the $7.5 billion investment in the Kemper Project's promise of more jobs and "clean coal" has instead resulted in indefinite suspension of coal gasification efforts and massive layoffs of plant and coal mine workers.

## Jurisdiction and Venue

10.      This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. §§ 1331 and 1343(a)(3).  This Court has jurisdiction over Plaintiff's SOX claim pursuant to 18 U.S.C. § 1514A(b)(1)(B), which permits Plaintiff to remove his claim from the Department of Labor to an appropriate U.S. District Court if the Secretary of Labor has not issued a final decision within 180 days.  This Court has jurisdiction over Plaintiff's Dodd-Frank Act claim pursuant to 15 U.S.C. § 78u-6(h)(1)(B)(i). This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

## Parties

11.     Mr. Wingo is a resident of the State of Alabama. He was employed by Southern Company[1] and Southern Company Services from August 2007 until February 15, 2016. During the time relevant to this complaint, Mr. Wingo was a "whistleblower" within the meaning of the Dodd-Frank Act, 15 U.S.C. 78u-6(h)(1)(A), and an employee under the common law of Mississippi.

12.     Defendant The Southern Company is a publicly traded company incorporated under the laws of Delaware, with its headquarters at 30 Ivan Allen Jr. Boulevard, Atlanta, Georgia 30308. The Southern Company does business in Kemper County, Mississippi, both directly and through its subsidiary company, Mississippi Power Company ("MPC"), a Mississippi company. The Southern Company also does substantial business and maintains offices and agents throughout Alabama. During all times relevant to this Complaint, The Southern Company was an employer within the meaning of the anti-retaliation provisions of the Sarbanes-Oxley Act, and the Dodd-Frank Act, 15 U.S.C. 78u-6(h)(1)(A), and the common law of Mississippi.

13.     Defendant Southern Company Services, Inc. ("Southern Company Services") is a company incorporated under the laws of Alabama, with its Principal

---

[1] Plaintiff specifically pleads that Mr. Wingo was jointly employed by The Southern Company and Southern Company Services. In the alternative, Mr. Wingo pleads that he was employed by The Southern Company. Further in the alternative, Mr. Wingo pleads that he was employed by Southern Company Services.

Place of Business in Birmingham, Alabama. Southern Company Services is the shared services division of Defendant The Southern Company and provides administrative and operational services to all of The Southern Company's operating divisions and provides engineering services to Alabama Power, Georgia Power, Gulf Power and Mississippi Power.  At all times relevant to this complaint, Southern Company Services was an employer within the meaning of the anti-retaliation provisions of the Sarbanes-Oxley Act, and the Dodd-Frank Act, 15 U.S.C. 78u-6(h)(1)(A), and the common law of Mississippi.

14.    During the time relevant to this Complaint, Defendant Thomas A. Fanning was the Chief Executive Officer of The Southern Company.  During the time relevant to this Complaint, Defendant Fanning was an officer or agent of a covered employer within the meaning of SOX, 18 U.S.C. § 1514(A)(a). Defendant Fanning's office is located in Atlanta, Georgia.  Defendant Fanning personally directed business and operations of The Southern Company and Southern Company Services in Alabama and Mississippi.

**Factual Allegations**

15.    In 2010 Southern Company, along with its subsidiary, Mississippi Power Company, began construction of the Kemper Project. Southern Company intended to make the Kemper Project a "clean coal" plant, implementing coal

gasification technology.  The plant's gasifier converted coal into synthetic gas or syngas. The combined cycle – an area distinct from the gasifier – contained two combustion turbines and a steam turbine that would generate electricity from syngas and steam, and was also able to run on natural gas. As a critical part of the Kemper Project, Southern Company stood to obtain hundreds of millions of dollars in federal tax credits and other financial incentives for the construction of the Kemper Project if it could achieve a commercial operation date of no later than May 2014.

**A. Southern Company promotes Mr. Wingo to Project Manager and he uncovers the severe problems with the Kemper Project reported COD schedule**

16.    In August 2011, Southern Company promoted Mr. Wingo to be a Project Manager at the Kemper Project, entrusting him with responsibility for the plant's coal gasification and gas cleanup systems.  As is well-documented in his personnel records, Mr. Wingo excelled at his project management initiatives, leadership and results, and Southern Company provided positive performance reviews, including the Southern Company's prestigious Southern Excellence Award for three consecutive years from 2012 to 2014.  Southern Company even appointed Mr. Wingo to join Southern Company's leadership program, intended to further develop the corporation's most promising managers.

17.     As was apparent from early in the Kemper Project, the work began to run significantly over-budget and behind-schedule.  Yet at the same time, Southern Company reported to the SEC and shareholders that it was on track to meet its original COD of May 1, 2014.  In August 2013, PM Alliance ("PMA"), a highly-experienced project management company, was contracted  to draft an updated project schedule to forecast an accurate completion date for the Kemper Project. By September 2013 the updated schedule demonstrated that the earliest plausible completion date for the Kemper Project would extend beyond May 2014, and most likely well into 2015.

**B. Mr. Wingo follows Southern Company's Code of Ethics and reports a May 2014 COD is not possible**

18.     In June 2013, in response to two embarrassing incidents which garnered major public attention, Southern Company employees were asked to participate in a "cultural survey" to root out complacency and encourage people to step forward without fear of retaliation.  The first incident, a major explosion, occurred in April 2013 during maintenance at Plant Bowen, a Southern Company combined cycle power plant in Georgia. The explosion was ultimately found to be caused by a failure to follow proper safety procedures, including a failure to follow standard written procedures, a failure to timely report known safety issues, and a failure to follow through and act on those issues. The second embarrassing incident involved a

recalled and amended SEC filing in which the Company was forced to admit "material weaknesses" in internal controls over financial reporting at Mississippi Power on the Kemper Project, something the Defendants promised was limited to Mississippi Power and did not extend to Southern Company. After these two embarrassing incidents, Defendant Fanning directed a "cultural survey" of all Southern Company employees because, as conveyed to Mr. Wingo by Mr. Randall Rush, General Manager of his division, Fanning was "sick of the country club mentality" and, in Mr. Rush's words, if we saw (expletive) we should call it (expletive) adding that, "[b]ad news is a dish best served warm." Southern Company's Chief Operating Officer, Mark Crosswhite, told Southern Company employees in a company-wide email the "cultural survey" was due to "failures that damaged equipment, diminished our Company's credibility and harmed our co-workers." Tim Pinkston, Mr. Wingo's direct supervisor and second in command of his division at the Southern Company, selected Mr. Wingo to participate in the "cultural survey."

19.     During the June 20, 2013 interview, Mr. Wingo reported to the Southern Company representatives that the Kemper Project's promised May 2014 COD was not realistically achievable. Mr. Wingo also made it clear that the Southern Company's public insistence on meeting an unachievable COD of May 1,

12

2014 was not only creating issues of compliance with SEC reporting requirements regarding potential shareholder losses, but was also leading to shortcuts affecting safety and damaging employee morale.  After the meeting, Mr. Wingo reiterated the concerns he had shared to his direct supervisor at Southern Company, Tim Pinkston, who agreed with Mr. Wingo's assessment.   Mr. Pinkston urged Mr. Wingo to become more involved in scheduling of Gasification Technology work in support of the Kemper Project. For Mr. Pinkston to properly discharge his responsibilities, "resource loaded scheduling," in which the various components of construction and testing are brought together to ensure proper match-up with initial plans, is a necessary process. This reporting and regular project status reports were also a requirement of the Cooperative Agreement with the United States Department of Energy's $254 million investment in the Kemper Project.

20.    Starting in July 2013, as directed, Mr. Wingo became more involved in project scheduling. On July 30, 2013, Southern Company named Mr. Wingo Project Manager over Startup Schedule. Southern Company directed Mr. Wingo to create and maintain a new "resource loaded schedule" which was in addition to and parallel to the official project schedule maintained separately at the time. Mr. John Huggins, Vice President of New Generation at Mississippi Power, approved the move and ordered Mr. Wingo to have his first resource-loaded project schedule prepared by

mid-September 2013.  In this new position, Mr. Wingo now reported to Mr. Joe Miller, Startup and Commissioning Manager for Kemper.

21.    After completing his first integrated project schedule in early September 2013, Mr. Wingo informed Mr. Miller, that a May 2014 COD was impossible, and that his new schedule said COD with perfect execution and zero contingency would be in Q4 2014 at best which meant, in all likelihood, COD would most likely run well into 2015.  Mr. Miller assured Mr. Wingo that he and PM Alliance could continue to work from the projected schedule, showing a COD past May 2014, while Mr. Miller consulted with others to determine a path forward.  In October 2013, Southern Company finally admitted in filings with the SEC and the Mississippi Public Service Commission ("PSC") that the COD had slipped past May 2014, which resulted in a loss of $133 million in tax credits.  However, the Southern Company still falsely claimed that it would reach COD in the fourth quarter of 2014, not well into 2015 as Mr. Wingo's and PM Alliance's resource-loaded schedule indicated.

22.    In January 2014, the Southern Company ordered a fourth Quantitative Risk Assessment ("QRA") by their auditor, PwC. In its QRA, PwC analyzed thousands of random interactions using optimistic, pessimistic, and expected durations for thousands of individual tasks to generate a probability-based schedule

outcome. This allowed Southern Company to confidently predict the statistical likelihood of achieving COD by a given date.  The January 2014 QRA 4, the first QRA to be based on Mr. Wingo's and PMA's resource-loaded project schedule, reported an 80% probability of a COD by May 2015 and only a 30% probability of COD by March 2015 or later, the first QRA to show 70% confidence of COD past 2014.

23.     Despite this clear evidence in its own records that a 2014 COD was not likely, in February 2014 Mr. Wingo discovered that Southern Company managers had, contrary to his warnings and documented findings, produced and promulgated a new QRA 4.1 reporting an 80% probability of a COD on or after December 1, 2014.  Moreover, Mr. Wingo found direct evidence that Southern Company had intentionally manipulated the resource-loaded schedule he and PMA had worked to create, providing false information in the new QRA projection to fraudulently claim that a 2014 COD was still achievable.

24.     The mechanics of this manipulation were not particularly hard to identify.  Southern Company regularly used the software program Primavera v.6 to predict project duration.  Built-in to that program, Southern Company uses a "logic ties" mechanism to ensure that an adequate minimum amount of time is given to each task and to maintain the proper sequence via "logic ties" for all dependent tasks

15

which must happen in sequence in the real world and therefore must happen in sequence in the electronic schedule.  PMA employee Josh Keller provided the schedule file to Charles Powell to create a "test case" scenario, with the understanding it would not become the official schedule as the "test case" schedule file had no oversight or approval from Mr. Wingo or PMA and no buy in or approval from other project stakeholders responsible for executing their tasks in the agreed durations and sequencing, a project management principle rigidly enforced by Mr. Wingo and PMA.  By examining Mr. Powell's "test case" schedule that was uploaded to the Primavera v.6 program, Mr. Wingo discovered that Mr. Powell had altered the allowable shortened task durations and overridden built in logic ties that ensure integrity in the forecasting to produce a COD of December 1, 2014.  Mr. Wingo knew that the six-month reported "improvement" in the COD schedule was the result of software manipulation and deception, motivated by concerns of losing hundreds of millions in tax benefits if COD slipped beyond 2014.  At that time, it was understood that Southern Company risked losing more than $500 million in bonus depreciation and other tax incentives if it did not reach COD by the end of 2014.  With the proper task durations and logic ties in place, however, completion by 2014 was known to be impossible and financial losses a certainty.

25.     Rather than acknowledge that it had misstated the 2014 COD date and admit that completion in 2014 was impossible, Southern Company instead pressured project engineers to speed up their work, sacrificing safety in a fruitless effort to meet an unattainable COD.  Mr. Wingo grew increasingly concerned that the Southern Company's willingness to compress the schedule and pressure employees to take shortcuts could lead to shortcuts on important safety standards which require time, effort and attention to detail, with potentially disastrous results in terms of human lives and destruction.  Mr. Wingo feared another Plant Bowen or even worse.

**C. Mr. Wingo reports the violations to MPC Vice President John Huggins**

26.     On February 27, 2014, MPC Vice President John Huggins spoke to a group of Southern Company engineers and emphasized the importance of the 2014 COD deadline.  He reiterated that "failure is not an option", failure meaning a slip to 2015, stressing the Company would face "financial Armageddon" if the COD slipped even one day into 2015.

27.     After the presentation, as they walked to Mr. Huggins car, Mr. Wingo reported directly to Mr. Huggins that Kemper Project managers, including Charles Powell, Joe Miller, and Steve Owen, had supplied false information to manipulate his schedule to justify a 2014 COD in the latest Production Meeting, something Mr. Wingo stressed was not possible absent the fraudulent manipulation of Mr. Powell

17

and others. Mr. Wingo also warned Mr. Huggins that Southern Company's reliance on false data to generate an unjustifiably optimistic QRA created the potential for violations of federal law intended to protect investors in public companies such as Southern Company. Mr. Huggins said "thanks", got in his car and left.  Worried that Mr. Huggins either did not understand or fully appreciate the gravity of what he had just been told, that night, Mr. Wingo followed up with Mr. Huggins, sending him an email summary of their conversation along with a CPA Journal article on the applicability of securities laws including Enron inspired Sarbanes-Oxley ("SOX") laws to mega-projects like the Kemper Project, stating:

> If we continue down the path we're on, the project will admit schedule slips only at the last minute, when things can't be hidden, glossed over or blamed away. In the end, the whole string of excuses and broken promises ruins morale (resulting in loss of key resources) and also ruins Southern Company's hard-earned and long standing reputation as a solid, principled company worthy of investor confidence. The SoCo [Southern Company] "brand" will be marred for a long time… **especially if this activity results in shortcuts affecting safety** or issues with Sarbanes Oxley. The mere fact we don't have rigorous controls puts us in jeopardy of Sarbanes Oxley.

28.     Several days later, instead of acting on these reports, Mr. Huggins called Mr. Wingo and berated him for putting his report in writing.  Rather than respond to the serious concerns, Mr. Huggins instructed Mr. Wingo to refrain from sending any more emails because the emails would allegedly be "discoverable" in any later lawsuits.  Mr. Wingo agreed to Mr. Huggins' order to refrain from sending

emails, but said they needed to meet as soon as possible to discuss the fraudulent scheduling and resultant safety issues.

## D. Mr. Wingo reports his concerns to the CEO of Southern Company, Defendant Fanning

29.     On March 6, 2014, in response to Mr. Wingo's request, Mr. Huggins and Ashley Baker (a Vice President overseeing the Kemper Project) met with Mr. Wingo in a small trailer at the plant site. In that meeting, Mr. Wingo repeated the observations he had already conveyed to Mr. Huggins.  In response, they both told Mr. Wingo not to worry about QRA 4.1 because Southern Company "does not take the schedule seriously anyway."  Mr. Huggins and Mr. Baker explained that the controlling factor in projecting the COD is "management opinion."  Mr. Wingo said he would accept their direction if they would send a notice stating that QRA 4.1 was a "test case" and not a product he or PMA had generated.  Mr. Baker and Mr. Huggins agreed to do so, but said they would have to get Director of Compliance Helen Nalley involved.  Ultimately, Mr. Huggins and Mr. Baker failed to follow through on their promises to engage Mr. Wingo with the Compliance Office or issue a notice or retraction regarding QRA 4.1.

30.     Alarmed by the clear indication that Mr. Baker and Mr. Huggins were part of the circle of managers that produced and promulgated the fraudulent QRA

4.1, and fearing for the legal penalties provided by SOX for executives who certify "internal controls" to the SEC regardless of whether they are aware of the lack of controls ("material weaknesses") or not, Mr. Wingo decided it was necessary protect both the Company and Defendant Fanning by reporting the fraud directly to him. Accordingly, on March 10, 2014, Mr. Wingo called Defendant Fanning and detailed management's manipulation of the schedules to produce a false 2014 COD.  He informed Mr. Fanning that he had raised these issues with Mr. Huggins and Mr. Baker, but no corrective action had been taken. Mr. Wingo also directly told Defendant Fanning that he was concerned that this manipulation of the COD could cause Defendant Fanning to sign an official SEC filing that contained false statements certifying internal controls and exposing both Defendant Fanning and the Southern Company to violations of federal law.

31.     In response, Defendant Fanning thanked Mr. Wingo for calling, assured him that he had done the right thing, and told him that he would have to get other people involved, including Ed Holland, Southern Company's Chief Compliance Officer and the President and CEO of Mississippi Power Company.  Although he said all of the "right things" to Mr. Wingo during the phone call, time would prove that Defendant Fanning would turn his attention to neutralizing Mr. Wingo instead of the fraud of QRA 4.1. Defendant Fanning would also continue convey fraudulent

projections on the Kemper Project COD for years, even repeating the falsehoods in sworn filings with the SEC, the Mississippi PSC, to shareholders, and to the public at large, in violation of both Southern Company's stated culture of integrity and federal and state laws.

## E. Southern Company Continued to ignore and reject Mr. Wingo's serious financial and safety concerns

32.     Between March and June 2014, consistent with Defendant Fanning's public call for a change in corporate "culture" from the embarrassing events of June 2013, Mr. Wingo continued to report ongoing SOX violations and legal and ethical issues relating to prudency, public health and safety to high level Southern Company officials, including Compliance Officers Helen Nalley, Tim Self, and Internal Audit Director Rick Allums. For example, by email to Ms. Nalley dated March 11, 2014, Mr. Wingo documented:

> The issue of integrity on this project cannot be compromised, not at this level. This is a chemical plant, a hydrocarbon processing plant. I would hope that questionable activity at this level be met with the highest level of scrutiny with resulting actions erring on the side of ethics, compliance and safety. If their actions have even come close to what I'm seeing, the penalties should be harsh. After all, these people have been provided compensation, authority and respect that comes with being entrusted, at this high a level, with the care and custody of Southern Company's good name and the health and safety of our employees and the public we serve.

33.     Ms. Nalley acknowledged receipt of this email but failed to respond to Mr. Wingo's continued pleas for integrity, safety, and compliance with the laws governing corporations and their employees, including the Southern Company.

## F. Southern Company responds to Mr. Wingo's reports by retaliating against him

34.     After the call to Defendant Fanning and subsequent meetings with the Compliance Office, Southern Company managers began marginalizing Mr. Wingo while other Southern Company managers began an investigation into Mr. Wingo, rather than getting to the bottom of the manipulated COD and other misconduct reported by Mr. Wingo.

35.     First, on March 13, 2014, Southern managers excluded Mr. Wingo from an important scheduling meeting to address QRA 4.1 and acknowledged that "things were changed in the schedule to protect ourselves" from the financial consequences of being honest about the completion date, namely the loss of tax incentives tied to completion in 2014 – the previously feared "financial Armageddon" Southern Company Mr. Huggins had warned against on February 27, 2014.  Later, Mr. Wingo learned that during the meeting, Southern Company managers debated scheduling changes, and ultimately agreed that Southern Company should not change the schedule, given the dire economic consequences that such a schedule change would

entail, including reporting those losses to the SEC, shareholders and state regulators. In excluding Mr. Wingo from this important meeting, Southern Company managers made it clear to Mr. Wingo that his attempts to inject honesty into the COD schedule would be rejected, and that other Southern Company managers should simply turn a blind eye to the fraudulent schedule or else be similarly marginalized and excluded.

36.     On April 2, 2014, in a further act of retaliation, Senior Project Manager Brett Wingard instructed Mr. Wingo to relinquish his responsibilities to Mr. Miller as the person to manage scheduling and managing PMA, claiming that, due to Mr. Wingo's efforts, "everything is now in place to prevent future issues."  Mr. Wingard deflected Mr. Wingo's concerns saying the move was necessary because Southern Company needed him to help locate instrument air stations now – a low-level task typically assigned to a junior engineer or field technicians.

37.     Mr. Wingo promptly informed Ms. Nalley and Mr. Self that he believed Southern Company had retaliated against him for making his disclosures and objections to Southern Company's misstatements about the true status of COD in SEC filings.  Southern Company managers again ignored Mr. Wingo and took no corrective action.  While Mr. Wingo felt increasingly marginalized and concerned about his future at Southern Company, he worked on other issues like training

simulators and startup simulators, but he also continued documenting and reporting his compliance and safety concerns with the hope of fixing these issues internally.

38.     On April 4, 2014, Southern Company managers Ms. Nalley, Mr. Self, and Mr. Allums finally scheduled a meeting with Mr. Wingo to discuss the results of their investigation into the QRA 4.1 report and the potential SEC violations and safety implications involved in the fraudulent scheduling.  Mr. Wingo reiterated his belief that Southern Company was violating SOX by publishing unsubstantiated, overly optimistic estimates of the Kemper Project COD.   In response, these purported compliance managers simply denied there was any basis for concern.  Mr. Wingo re-emphasized that entrusting unethical managers who had lied about our schedule with zero consequence was an open invitation for these same unethical managers to also take shortcuts in the dangerous work remaining, with potentially catastrophic safety consequences.

39.     On May 13, 2014, at Mr. Wingard's direction, Mr. Wingo handed over his scheduling responsibilities to Mr. Miller, his designated replacement.  Mr. Wingo urged Mr. Miller to keep the schedule "real."  Mr. Miller replied that if he did that, he would be out of a job.  Southern Company's removal of Mr. Wingo's scheduling responsibilities constituted a significant and humiliating diminution in his core

duties ~~clearly  designed~~clearly designed to remove him from a position in which he would be privy to the ongoing fraudulent COD projection.

40.    On May 30, 2014, at Mr. Wingo's request, Mr. Wingo again met with Ms. Nalley and Mr. Self to raise his ongoing concerns about Southern Company's financial reporting.  In addition, he raised concerns about his diminished role at the Kemper Project and his career with Southern Company, given his removal from scheduling and project management duties as a result of having challenged the false schedule.

41.    On June 6, 2014, Jeff Peoples, a Southern Company Human Resources Executive, met with Mr. Wingo and asked him about his job duties, who managed him, and who supervised him.  Mr. Wingo correctly understood this as an indication that his position at Southern Company was in jeopardy and that compliance managers and executives had decided that the best way to deal with his warnings about scheduling fraud, SOX and potential safety issues arising from shortcuts by unethical managers in construction and commissioning was to manage him out of his position. Thereafter, Southern Company managers increasingly isolated Mr. Wingo, excluded him from meetings and took away all project management responsibilities.

**G. Mr. Wingo learns that Southern Company violated Mississippi law in operating the "combined cycle" portion of the plant without required safety checks and inspections**

42.    Though Mr. Wingo was no longer managing people onsite, on June 27, 2014, John Shiver, with Hargrove Engineers + Constructors ("Hargrove"), an inspection manager who had previously reported to Mr. Wingo onsite, informed Mr. Wingo the Company had ordered his crews to do an "emergency walk down" inspection of the combined cycle portion of the plant because Southern Company planned to put the combined cycle portion of the plant into full commercial operation in the near future.  The combined cycle portion of the plant, operating on natural gas rather than coal, had already synchronized to the grid in October 2013 and had been running intermittently for testing purposes for nine months thereafter.

43.    Mr. Shiver explained that Southern Company had asked the Hargrove team to inspect the pipes using only the Piping and Instrumentation Diagrams ("P&IDs"), which illustrate how the pipes connect and are not drawn to scale. In contrast, Southern Company did not instruct the team to use piping isometrics, which are drawn to scale. Industry standard safety inspections and Southern Company's own policies, contained in the Basic Quality Plan ("BQP"), required checking pipes against both types of diagrams.

44.     Mr. Shiver also told Mr. Wingo that the Hargrove team asked Southern Company managers for records of any previous inspections to use as a starting point, and the Southern Company managers revealed that there were no prior records or documentation of any safety inspections of the piping apparatus in the combined cycle.  This fact alone was troubling because the combined cycle portion of the plant had been running for testing since October 2013, running intermittently for over nine months at high pressures and temperatures.

45.     Mississippi state law requires that certain boilers and pressure vessels conform to standards set forth by the American Society of Mechanical Engineers ("ASME").  *See* Miss. Code § 45-23-13; *see generally* Miss. Code tit. 45, ch. 23. Companies operating such vessels must have a valid inspection certificate issued by the state.  *See* Miss. Code § 45-23-51.  Companies must also submit a statement to the State each year, signed by an engineer with supervision over the inspections, which identifies the covered vessels that were inspected that year and certifies that such inspection was conducted pursuant to the requirements set forth by law.  *See* Miss. Code § 45-23-51.  To operate covered vessels without a valid inspection license is a criminal misdemeanor.  *See* Miss. Code § 45-23-51.  Several piping systems within the combined cycle were covered under these laws.

46.     In the course of performing the walk down, the Hargrove inspectors identified hundreds of punch list items, many of which presented serious safety issues.  The Hargrove inspectors observed that several pipe supports and pipe hangers were improperly installed or damaged.  At least one of the specific safety issues the Hargrove inspectors identified involved piping that is covered under Mississippi's ASME compliance and inspection laws.  Mr. Wingo and the Hargrove engineers realized that without proper pipe supports, the pipes could rupture when expanding under heat, especially after multiple startup cycles fatigue the metal.

## H. Mr. Wingo reports the violation of Mississippi law to Southern Company managers

47.     On June 27, 2014, Mr. Wingo emailed Ms. Nalley and Mr. Self to notify them about the lack of documentation and the improperly installed pipe hangers brought to his attention by the Hargrove engineers.

48.     Ms. Nalley and Mr. Self never replied to Mr. Wingo's email with a substantive response to the issues he raised.  Throughout late June and July 2014, Mr. Wingo primarily focused on his other Kemper related work, including working with Honeywell on a new plant startup simulator and providing support to a training simulator in Frederick, Maryland.  Having been essentially stonewalled by the Compliance department, and sidelined by Southern Company managers, Mr. Wingo

spoke with a few members of the Gasification Technologies division, including Landon Lunsford, Brent Duncan, Tyler Littrell, Brandon Davis, and Matt Nelson among others about the discrepancies between the as-designed and as-built condition of the combined cycle portion of the plant.  Information he learned during those discussions heightened his concerns about the Southern Company's misrepresentations, failures in leadership and corporate culture, and the Company's increasing drive to prioritize schedule over safety.

49.    On July 29, 2014, Mr. Wingo met with the Hargrove team to discuss the safety issues in further detail.  The inspectors described some of the problems with the pipe hangers, including that pipe hangers were not connected to structural steel and that some of the shoe supports were not even touching the steel.  Despite the inspectors' requests, the Southern Company managers were unable to provide them with documentation that the combined cycle was built to specifications or previously inspected at all.  Not surprisingly, the Hargrove inspectors feared not only for the safety of plant personnel but also for potential liability.

50.    On July 30, 2014, a Hargrove team member provided Mr. Wingo with photographs one of his crew had taken of improperly installed and damaged pipe supports and a set of P&IDs with mark-ups to show where the construction deviated from the design.  Mr. Wingo could immediately see that piping and valves had not

been installed per the design which could allow a dangerous release of high pressure steam.  Mr. Wingo was also told that every Hargrove inspector reported similar issues with pipe supports but did not take pictures as pipe supports were not part of their assigned P&ID inspection scope.

51.    On Friday August 1, 2014, Mr. Wingo called Mr. Wingard to find out when the Company intended to declare the combined cycle commercial, or operational.  Mr. Wingard informed Mr. Wingo that Southern Company intended to declare the plant commercial over the weekend.  Given that there was no indication or documentation that the combined cycle was safe to operate, Mr. Wingo was deeply concerned about the plan to proceed without the necessary rigor in place to protect the plant's workers and the community. Accordingly, Mr. Wingo made plans to report the Hargrove team's findings, including the lack of previous safety inspections, to Mr. Wingard in person on the following Monday, August 4, 2014, to convince him that the safety concerns he had raised were serious and the most prudent action was to shut down the combined cycle to protect worker safety and address the underlying issues.  That weekend, knowing that he needed buy in from senior management to stop the plant, Mr. Wingo prepared documentation including photographs of damaged and defective pipe supports provided by Hargrove and case

histories of major industrial accidents that had occurred as a result of similar deficiencies in other plants.

52. As planned, on Monday morning, August 4, 2014, Mr. Wingo attempted to find Mr. Wingard to present his concerns, but discovered that both he and Randall Rush, General Manager of Gasification Technologies, the division in which Mr. Wingo worked, were out of the office that day.

53. On the following morning of August 5, 2014, Mr. Wingo located Mr. Rush, but not Mr. Wingard, in the office.  He presented Mr. Rush with the Hargrove team's photographs along with his commentary pointing out the safety issues.  Mr. Rush asked for a copy without any of Mr. Wingo's graphic and dire commentary to show to others. Mr. Wingo provided the photos and also emailed Mr. Wingard with the same documents.

54. Mr. Wingo told Mr. Rush that he believed the combined cycle should be shut down immediately until the Southern Company could verify proper installation, either by producing documentation attesting to this, or by conducting a thorough inspection.  Mr. Wingo noted that continuing to run the combined cycle would not be fair to the workers at the plant who were unaware that there was no proper documentation in place to verify their workplace was safe, adding that, as a project manager, he had a responsibility to protect the workers.

55.    Mr. Rush, a chemical engineer with a law degree, appeared indifferent to Mr. Wingo's concerns for the workers' safety and attempted to minimize Mr. Wingo's position at Southern Company by commenting, "You're not a project manager.  You're just an engineering manager." Mr. Wingo rightly surmised that this was the beginning of an attempt to marginalize and discredit him, even going so far as to deny he was ever a project manager on Kemper.

56.    Mr. Rush challenged Mr. Wingo several times throughout the day, asking him various technical questions about the pipes in the photographs, which Mr. Wingo, as a mechanical engineer, was able to answer.  For example, Mr. Rush asked since the piping had not already failed in operation, why the Southern Company still needed to be concerned with its integrity.  Mr. Wingo explained that pipe failures can occur when pipes become overstressed and fatigued after multiple thermal cycles, primarily due to fatigue caused by multiple startups and shutdowns. Mr. Rush told Mr. Wingo that he had done the right thing "this time," implying that he did not do the right thing in the past, when he presented his concerns about the scheduling improprieties to Mr. Huggins and Mr. Fanning.

57.    On August 7, 2014, after receiving no assurance from Mr. Rush or Mr. Wingard that his safety concerns were being addressed, knowing the plant was still running, Mr. Wingo sent a desperate email to Assistant Plant Manager Brooks

Epting, who was in charge of the Kemper Project's mechanical integrity program and who had previously worked as an assistant manager for Mr. Wingo in 2011 and 2012.  Mr. Wingo explained his concerns to Mr. Epting regarding the design isometrics and the compliance with ASME. The same day, Mr. Wingo sent a similar email to Ms. Nalley and Mr. Self who had allegedly been investigating Mr. Wingo's allegations of shoddy construction and missing inspection records since June 27 but who had failed to provide any findings or feedback to that point.

58.     On August 8, 2014, Mr. Epting informed Mr. Wingo that three teams had inspected the piping in the combined cycle and had discovered that the pipe support problems the Hargrove team identified in the photos were in the combined cycle but were on condensate pipes, not pipes that carry high-pressure steam.  Mr. Epting advised Mr. Wingo that the piping was in need of repair, but it was not urgent, and could be addressed during the next scheduled outage.  Mr. Epting further advised Mr. Wingo that the teams had inspected all of the high-energy piping in the combined cycle, and found one potentially significant item which they sent to Jeff Goodwin, Southern Company's main ASME Pipe Stress and Metallurgy expert, for review.

59.     Mr. Wingo accepted Mr. Epting's assurances that repairs on the pipe supports, including those shown in the Hargrove photos, would be made during the

next outage, but Mr. Wingo remained concerned about the overall safety of the combined cycle, given that a complete inspection using isometrics had still not been performed, documented or produced.   Moreover, Mr. Epting's team had only performed a brief visual inspection that did not meet basic standards.   For example, the team did not take measurements to verify the proper locations of the pipe supports, guides, stops, valves, or gaskets, nor did they verify proper gasket installment between flanges.   Typically, a full inspection would take months to complete, and could not possibly be condensed into less than eight hours.   Mr. Epting did not confirm that there were any records of inspection for quality and safety from before the combined cycle started running in October 2013, much less August 2014.

60.    Following his correspondence with Mr. Epting, on August 8, 2014, Mr. Wingo once again warned Mr. Wingard that the Southern Company would be in violation of Mississippi law if it operated the combined cycle before verifying that it was ASME compliant.   Mr. Wingo asked him to shut down the combined cycle, fearing for the safety of the workers and the public.   Mr. Wingard refused to address the issue and continued to give noncommittal responses, vaguely assuring Mr. Wingo that "things [were] getting better" and that Mr. Wingo had to "trust people to do their job[s]."

61.     On August 8, 2014, Southern Company manager Tim Pinkston told Mr. Wingo that he would accompany Mr. Wingo to a meeting in Houston for a Kemper related project that Mr. Pinkston did not normally oversee.   He had never accompanied Mr. Wingo on these trips before.   After the meeting on August 13, 2014, Mr. Pinkston asked Mr. Wingo to accompany him to the lounge area of the Houston hotel where they were staying.   Once he had taken Mr. Wingo aside, Mr. Pinkston warned him to stop raising safety issues and told Mr. Wingo to leave those matters to the people tasked with addressing safety.

62.     Mr. Wingo reiterated to Mr. Pinkston that the Southern Company's decision to start the combined cycle without proper documentation was unlawful and dangerous.   Mr. Wingo added that he would be satisfied if the Southern Company would show him any existing inspection records from the combined cycle which would allay Mr. Wingo's fears that the combined cycle could safely be run.   Mr. Pinkston told him that he would never be given that level of access or involvement and directed him to let the matter go.   Mr. Wingo stated that he was unwilling to sit silent while fellow employees were oblivious to the fact that shortcuts were taken due to schedule pressure and while his fellow workers were in an uninspected and therefore unsafe plant.   Mr. Pinkston leaned toward Mr. Wingo and warned him that he was "digging a hole" for himself.   Mr. Wingo understood this comment to be a

threat to his career.  He also understood that Mr. Pinkston traveled with him to Houston for the sole purpose of conveying the threat, in yet another unavailing effort to intimidate Mr. Wingo and force him to remain silent about his concerns.

63.     On August 15, 2014, Southern Company issued a press release advising that the combined cycle had been placed into commercial operation, and that in the last 11 months, the combined cycle passed "all applicable performance and environmental tests."  This statement was false as the plant had not been fully inspected nor had it been properly approved for operation.

64.     One week later, on August 22, 2014, Mr. Wingo told Mr. Wingard about Mr. Rush and Mr. Pinkston's recent reprimands and retaliatory treatment of him for raising safety concerns.  Mr. Wingard told Mr. Wingo he was doing a great job as an employee because he consistently developed solutions to problems.  Mr. Wingard then said that Southern Company employees were "handcuffed" when it came to certain issues because they "can't take ownership" of issues outside of their area of responsibility.  Mr. Wingard warned Mr. Wingo that if he continued to push people about his concerns, they would push Mr. Wingo out.  Mr. Wingard said that Mr. Wingo needed to learn how to bring up his concerns and then "let it go," without checking back to see if those concerns were addressed, if he wanted to remain employed.

65.     During the same conversation, Mr. Wingo once again raised the issue of the combined cycle, reiterating that it should not have been put into commercial operation.   Mr. Wingard claimed that the improperly installed pipe supports identified by the Hargrove team were not located in the combined cycle.   Mr. Wingard admitted that there had not been "proper sign off," but insisted that the pipes in question were safe because the photos of defective and damaged pipe supports were not located in the combined cycle and therefore, not in service because Plant Manager, Bruce Harrington, told him he had located these photos in the non-energized and non-operational Gasifier Island, something Mr. Wingo knew to be untrue.

66.     Mr. Wingo knew that Mr. Harrington's explanation was false and expressly informed Mr. Wingard of that.   Not only had Mr. Epting confirmed that the pipes in question were in fact in the combined cycle, but Mr. Wingo was able to independently verify that the photographs were taken in the combined cycle based on the GPS information embedded in the digital photograph files.   Mr. Wingo told Mr. Wingard that the reason pipes had slipped off of the trapeze pipe hangers was due to thermal expansion which means the piping had been heated up to process temperatures.   This meant that the pipes in the photographs were part of an energized, operational system – and that the hangers were not properly installed.   Mr.

Wingard admitted that there was no excuse for the pipes to be improperly installed regardless of their location, but insisted that the situation was now under control and reiterated that Mr. Wingo simply needed to learn to trust others to do their jobs.

67.    On August 27, 2014, Mr. Wingo asked Mr. Self if he could review the Compliance department's draft report on Mr. Wingo's safety concerns.  Mr. Self told him that he could not share it.  Later that day, Mr. Rush told Mr. Wingo to stop raising safety concerns and warned Mr. Wingo that he was "digging a hole," the exact same threat issued two weeks earlier by Mr. Pinkston.  Mr. Rush emphasized that Mr. Wingo needed to let things go and leave people alone.  Remarkably, he told Mr. Wingo: "The plant's been running a long time, if they've got problems then they've got problems, then you've raised the issue and you can say you were right." Mr. Wingo said being able to say he was right was "the last thing [he] ever wanted to do." At this point, having exhausted all avenues to correct serious compliance and safety issues, Mr. Wingo decided the only way to start the process of fixing these pervasive cultural issues was to do his best to fully document them for Southern Company Defendants so they could no longer claim ignorance and would be forced into action.

## I. Mr. Wingo documents the violations in a written report to Southern Company

68.     Based on both the lack of any meaningful response from Southern Company managers and even more so, their retaliatory responses, Mr. Wingo grew increasingly concerned about the safety of the plant workers and the public each day the plant operated without proper safeguards, and management's stalling and disregard of his concerns only intensified his feelings of fear and distress. Mr. Wingo decided to then take a two-week vacation or paid leave of absence, to allow Southern Company time to review his documented violations of the law. He made clear that he was not resigning from his employment and wished to continue to be employed at Southern Company. On August 29, 2014, one day after Mr. Wingo requested a two-week vacation while the dust settled, Southern Company reacted by placing Mr. Wingo on forced paid administrative leave. Mr. Peoples revoked Mr. Wingo's access to the Southern Company network, had him turn in his Southern Company badge, and asked him to collect his personal effects from the offices.

69.     On September 23, 2014, as promised, Mr. Wingo sent Southern Company's Chief Operations Officer Kim Greene a letter outlining his concerns with scheduling improprieties and the safety of the combined cycle, and offering to resolve his potential legal claims for retaliation in violation of the Sarbanes-Oxley Act on verifiable assurance that his safety concerns had been addressed. Attached

to this correspondence was Mr. Wingo's detailed documentation of his concerns, comprised of 285 pages of timelines and supporting exhibits including:

- A summary of Mr. Wingo's concerns with the Southern Company's activities, namely, the scheduling violations and the safety inspection violations;

- A personal letter from Mr. Wingo to Ms. Greene that reiterated his concerns, explaining that he did not feel safe from retaliation at work, nor did he feel safe working in a plant with potential safety hazards;

- Summary and detailed timelines outlining Mr. Wingo's protected activity of alerting Southern Company officials to the scheduling fraud and safety implications of rushing to meet an impossible COD; and

- Various exhibits in support of Mr. Wingo's claims, including copies of falsified construction schedules and QRA 4.1; the various emails in which Mr. Wingo blew the whistle to members of Southern Company management; the Hargrove team's report on improperly installed pipe hangers and photographs from their safety inspection; the Southern Company's own BQP outlining the standards for pipes and pipe hangers; and Mr. Wingo's performance reviews.

70.     Mr. Wingo's specifically raised the serious allegation that the Southern Company, despite months of warnings, was still misleading stakeholders and regulators about the cost and schedule of the Kemper Project.  Mr. Wingo stated that realistic and safe goals for COD should be set for mid-2016, not May 2015 as was currently being reported, noting:

> To this day, Southern Company continues to ignore major scheduling issues that hinder them from meeting the intent of SEC reporting requirements and prevents them from making prudent decisions for our

40

stockholders,          customers,          and          employees.

71.     Mr. Wingo's documentation specifically raised the potential illegality under federal and state law of misrepresenting the safety inspection record of the combined cycle.  He stated:

> It was a proven fact that we did not follow our established E&CS procedures including the most basic component, the [Basic Quality Plan], prior to the combined cycle startup, testing or handover to MPC. It is known in E&CS, Southern Company and the rest of the industry, that quality has a direct impact on safety.  The stated purpose of the [Basic Quality Plan] is to ensure we protect the safety of our employees and the public and that we comply with all applicable codes and laws.

## J. Southern Company sets its law firm, Jones Day, to conduct a purported (and now clearly discredited by the facts as now revealed) "investigation"

72.     On October 16, 2014, Southern Company Vice President Christopher Miller sent a letter to Mr. Wingo's then-attorney, acknowledging receipt of Mr. Wingo's September 23, 2014 correspondence.  Mr. Miller stated that Southern Company had engaged the law firm of Jones Day to conduct a full review of the subject matter of Mr. Wingo's claims, and he further claimed that this investigation began before Southern Company received Mr. Wingo's September 23, 2014 letter. Mr. Miller stated:

> Specifically, your client appears to be concerned about two issues: (i) Mr. Wingo believes the Commercial Operation Date ("COD"), as disclosed by the Company in its securities filings, is unrealistic and unattainable; and (ii) Mr. Wingo believes there is insufficient

documentation to allow for the "lawful safe handover" of the Kemper Plant by Southern to Mississippi Power Company ("MPC").

73.    On December 9, 2014, Mr. Wingo and his then-counsel met with attorneys from Jones Day.  Mr. Wingo engaged in further protected conduct by reiterating his claims that Southern Company had produced and promulgated a QRA 4.1 that projected a COD of December 1, 2014 and a less than 70% chance of slipping into 2015, but was based on knowingly incorrect and intentionally manipulated information.  Mr. Wingo also reiterated his concern that the Southern Company had put the public and workers in harm's way by operating the combined cycle without proper inspections or inspection records.  To date, Southern Company has not made available the Jones Day's report to Mr. Wingo or in any public forum, but based on the Southern Company's documented representations to OSHA, apparently (and directly opposite to the reality now glaringly uncovered for the Kemper Project) Jones Day reported a pre-conceived narrative, i.e. that the COD manipulation and safety concerns could not be substantiated.

74.    Mr. Wingo's forecasts that COD would not be achievable until mid to late 2016, and not in 2014 or even 2015, have been fully borne out by cold, hard reality.  At this point, no claim can be made that a Jones Day investigation or report that justifies Kemper Project COD with "clean coal" operation in 2015 is in any way legitimate, especially when Mr. Wingo's September 24, 2014 letter to Kim Greene

stated for very specific reasons, reasons that have been proven over time, that realistic and safe goals for COD should be set for mid-2016, which the Defendants did not admit publicly until late October 2016. Upon information and belief, the Jones Day report was deliberately contrived to conclude that Mr. Wingo's reports were unfounded, and that this conclusion, while demonstrably false, was used by Southern Company as further justification for retaliatory misconduct, including his firing by Southern Company.  Mr. Wingo's concerns about inspection issues in the combined cycle portion of the plant, which hinged in large part on photos of damaged and improperly installed pipe hangers, have been dismissed by the Southern Company, which continues to claim that these photos were not in the combined cycle but in the gasifier island, something easily disproved by GPS tags on the digital photos, emails from plant personnel, and positive identification via 3D models.

**K. Mr. Wingo files a whistleblower submission with the SEC, alleging that Southern Company engaged in securities violation, which was referenced in his SOX retaliation complaint submitted to OSHA.**

75.    On October 28, 2014, after determining the Southern Company had no desire or intention to regulate matters internally, Mr. Wingo submitted a Form Tip, Complaint, or Referral (TCR) to the SEC, alleging that the Southern Company had engaged in fraudulent, material acts and practices in the course of business in

violation of Rule 10b-5 by misrepresenting the plant's construction schedule and construction milestones to federal regulators and investors

76.    Specifically, the TCR submission detailed how, as early as mid-2012, the Company deliberately broke logic ties in its computerized scheduling system to produce an artificial COD of May 2014.  Yet in its August 2013 Form 10Q filing with the SEC, the Southern Company stated that the COD was May 2014, despite the fact that it knew or should have known that this was not possible.  In its October 2013 Form 8K filing, the Southern Company announced a new COD to occur in the last quarter of 2014, despite an internal QRA from earlier that month reporting that the COD would most likely not occur until March 2015.  The Southern Company continued to falsely report a 2014 COD in its November 2013 10Q.

77.    Mr. Wingo's submission also detailed how the Southern Company would likely, in the near future, deliberately misrepresent the achievement of a construction milestone called "First Fire" by claiming to investors that Kemper Project had successfully achieved "First Fire," without explaining to investors that the Southern Company materially altered the definition of "First Fire" to fall far below the original meaning and intent of "First Fire" or "First Gasifier Heatup" which was supposed to clear the tremendous technical hurdles and risks of new, first of a kind "clean coal" technology by proving the gasifier systems were ready to

44

gasify coal at high temperatures and pressures.  Mr. Wingo warned the SEC that instead of running the gasifiers at high temperature and pressure, the Southern Company would simply light a pilot light, blow air across it and declare this inconsequential act as a successful "major" milestone.

78.    In March 2015, the Southern Company did exactly as Mr. Wingo predicted by claiming to investors that it achieved "First Fire," without actually conducting a test of any consequence, a test that cleared no major technical or commercial hurdles and not worthy of a press release declaring the successful completion of a "major" milestone by simply blowing air across the pilot lights on the startup burner. The Southern Company knew or should have known the test actually executed fell far short of meeting the definition of a major milestone as proven by the fact that just months earlier, during an earnings call on February 4, 2015, CFO Art Beattie describes airflow tests as a "sub project" or "micro milestone" to the actual "major milestone" of "First Fire."

79.    The SEC initiated an investigation of Southern Company's potential violations of securities laws.   Southern Company publicly acknowledged the investigation in May 2016 when *The New York Times* informed Southern Company that it knew of an SEC investigation of the Kemper project.   Jeff Shepard, a Mississippi Power spokesman said Southern Company realized there was

considerable public awareness of the investigation, so it was time to disclose it. Although the article did not identify the date on which Southern Company first knew of the investigation, Southern Company had warned its employees that an investigation was underway in December 2015, pointing directly to likely knowledge of the investigation well before December 2015 and likely before the August 14, 2015 termination phone call from Mr. Peoples.

## L. Mr. Wingo files a complaint for SOX Retaliation with OSHA

80.    In December 2014, Southern Company's counsel told Mr. Wingo that he would not be allowed to come back to work, asserting that Mr. Wingo, rather than Southern Company, was not worthy of trust.   Later, Southern Company's attorney told Mr. Wingo that his career with Southern Company was over.  He emphasized that Mr. Wingo would never be returning to work. At that, Mr. Wingo sought legal protection by filing a SOX retaliation complaint with OSHA on February 14, 2015.

81.    During the process, OSHA attempted to facilitate a settlement between Mr. Wingo and Southern Company.  In all of those subsequent efforts to negotiate a settlement through July 7, 2015, Mr. Wingo, who was proceeding on his own and without a lawyer, consistently reiterated his desire and willingness to return to Southern Company, on condition that his safety concerns were addressed and the individuals responsible for creating those problems were held accountable.

82.    OSHA issued its Findings and Order on Mr. Wingo's SOX retaliation claim on January 27, 2017, concluding that there was reasonable cause to find a violation.   OSHA's official report detailed Mr. Wingo's protected conduct of alerting managers, executives and compliance officers about the scheduling issues in February and March of 2014 and Southern Company's continuing pattern of retaliatory treatment, from removing him from scheduling responsibilities and isolating him from the Kemper Project, through refusing to allow him to return from administrative leave, to terminating him in February 2016.   OSHA concluded that Southern Company's explanations for its decision – that Mr. Wingo had been disruptive, made inappropriate comments about the professionalism and ethics of senior leadership, and the general lack of mutual trust – were not supported by the evidence because Southern Company had previously lauded and rewarded Mr. Wingo's performance.

83.    OSHA concluded that Southern Company would not have fired Mr. Wingo if he had not engaged in protected activity. OSHA ordered Southern Company to reinstate Mr. Wingo and pay him backpay and damages because of its "callous and reckless disregard" for Mr. Wingo's rights, and it's "irresponsible disregard to the whistleblower protections enforced by OSHA."   It ordered that

Southern Company reinstate him immediately.  To date, Southern Company has refused to do so.

## M. Southern Company Defendants are warned about the Company's continued misrepresentations in certifications and official proceedings before the State of Mississippi

84.    In 2010, the Mississippi Public Service Commission ("PSC" or "the Commission") relied in part on Southern Company's representations that construction would be completed by the end of 2014 when it approved an increase to the amount that Kemper Project's costs can be shifted the customers, totaling $2.88 billion – an action which was challenged in court.  Later, the Mississippi Supreme Court held that PSC had not made any findings to support its decision to grant authority for shifting of costs for the Kemper Project, and remanded the matter to the PSC for further review.  *See Sierra Club v. Miss. Pub. Serv. Comm'n*, 82 So.3d 618 (Miss. 2012).  And in December 2013, the Southern Company began to submit filings to the Commission as the Commission prepared to do a "prudency review" to determine whether the Southern Company acted reasonably, which would inform its determination as to whether to allow the rate increases pushed onto customers to stand.

85.    In August 2014, the Commission began holding hearings for the prudency review.  In testimony during the prudency hearings before the

Commission, Southern Company officials, including John Huggins and Steve Owen, falsely continued to claim that Kemper Project would meet a COD of 2015. Southern Company managers also claimed that adequate "project controls" – which include safety processes and safeguards – were in place, which was belied by the failure to conduct timely, adequate and properly documented inspections of the combined cycle. Southern Company omitted from its submissions and testimony, among other necessary facts, it would lose another $254 million in tax credits for failing to successfully demonstrate the plant's carbon capture technology by April 2016.

86.    In Mr. Wingo's reports to Southern Company management regarding scheduling improprieties and safety concerns, he noted on multiple occasions that Southern Company was not behaving "prudently" and, as such, was perpetrating a fraud upon the PSC.

87.    For example, a May 14, 2014, email to Ms. Nalley and Mr. Self, a copy of which was also included in Mr. Wingo's letter to Ms. Greene, Mr. Wingo pointed out that Southern Company had an obligation to show prudency when spending its capital in order to justify shifting costs to consumers: "The regulators, if they could see the waste and purposeful inefficiency going on right now, would rightfully question the portion of the cost below the cap."

88.     In a June 10, 2014 email to Ms. Nalley and Mr. Self, Mr. Wingo noted that he raised his concerns in part to try to prevent Southern Company's name from "becoming synonymous with cheating and lying to customers and investors."

89.     In Mr. Wingo's September 23, 2014, correspondence with Ms. Greene, he reported that the representations the Southern Company made regarding cost, scheduling, quality, and safety went "beyond the pale of prudency," and that "the Mississippi PSC and the rate payers of Mississippi Power deserve better."

## N. Southern Company Defendants terminate Mr. Wingo in retaliation for his protected activity

90.     On August 14, 2015, the Southern Company terminated Mr. Wingo effective February 15, 2016.  Southern Company manager Peoples told Mr. Wingo that his termination was a result of a lack of "mutual trust," and that Southern Company could not trust Mr. Wingo "to take direction from upper management."

91.     As threatened, Southern refused to reinstate Mr. Wingo and stopped paying his salary.  It also cut off his family health insurance effective February 15, 2016.  Despite his diligent efforts to secure employment, Mr. Wingo remained unemployed until August 15, 2016.  The only offer he received, despite submitting numerous applications, required that Mr. Wingo accept an approximately 70 percent reduction in compensation in a position where there is limited room for

advancement. However, Mr. Wingo is thankful to be employed and grateful to the company who hired him.  The professional and personal costs to Mr. Wingo of attempting to live up to the Southern Company's stated Code of Ethics and demanding accountability for Southern Company Defendants to do the same, also continue.

## COUNT I

**RETALIATION IN VIOLATION OF THE SARBANES-OXLEY ACT AGAINST DEFENDANTS SOUTHERN COMPANY, THE SOUTHERN COMPANY, SOUTHERN COMPANY SERVICES INC. AND DEFENDANT FANNING**

92.     At all times relevant to this Complaint, Mr. Wingo was an employee of Southern Company and/or Southern Company Services.   Defendant Fanning is an officer and/or agent of Southern, and all are subject to 18 U.S.C.A. § 1514A(a).

93.     Under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, or SOX, it is unlawful for an employer or any officer, employee, or agent of such an employer to discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee to provide information to a person with supervisory authority over the employee regarding any conduct which the employee reasonably believes constitutes a violation of 18 U.S.C. §§ 1341, 1343, 1344, or 1348, any SEC rule or regulation, or any Federal law relating to fraud against shareholders.

94.     Mr. Wingo engaged in protected activity by repeatedly reporting Southern Company's potential and actual misrepresentations in its SEC filings and to its shareholders to numerous management officials and executives, including but not limited to Defendant Fanning.

95.     Based on its knowledge of Mr. Wingo's protected activity, Southern Company Defendants retaliated against Mr. Wingo by subjecting him to retaliatory harassment and threats, forcing him out on paid administrative leave, refusing to reinstate him, terminating him on August 14, 2015, effective February 15, 2016, and even filing a public lawsuit against him.

96.     The reasons provided by Southern Company Defendants for terminating Mr. Wingo's employment provide direct evidence of the retaliation and violation of Dodd-Frank, and other reasons offered as pretextual and were expressly rejected by OSHA.

97.     Southern Company Defendants' actions have caused and will continue to cause Mr. Wingo substantial economic loss, including lost salary, bonuses, benefits, and other compensation; damaged his professional reputation; and caused him significant emotional distress and psychological injury.

## **COUNT II**

## RETALIATION IN VIOLATION OF THE DODD-FRANK ACT AGAINST DEFENDANTS THE SOUTHERN COMPANY AND SOUTHERN COMPANY SERVICES INC.

98.     At all times relevant to this Complaint, Mr. Wingo was an employee of Southern Company and/or Southern Company Services.

99.     Under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 15 U.S.C. § 78u-6(h) ("Dodd-Frank"), it is unlawful for an employer to discriminate against a whistleblower for any act done by the whistleblower in making disclosures that are "required or protected" under the Sarbanes-Oxley Act of 2002.

100.     Under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, it is unlawful for a covered employer to discriminate against an employee for providing information which the employee reasonably believes constitutes mail fraud, wire fraud, bank fraud, securities or commodities fraud, a violation of any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information is provided to a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).

101.     Mr. Wingo engaged in protected activity repeatedly by submitting a

Form Tip, Complaint, or Referral (TCR) to the SEC, alleging that Southern Company had engaged in shareholder fraud by misrepresenting the plant's construction schedule and various construction milestones to federal regulators and investors.  Southern officials were aware of Mr. Wingo's intent to file complaints with regulators, including the SEC, and law enforcement authorities, as he noted in his letter to Ms. Greene dated September 11, 2014, that if the matter could not be resolved internally, it would be resolved "from the outside."  Southern Company officials also were aware that after Mr. Wingo filed his SOX whistleblower complaint it was transmitted to the SEC as a matter of course.  29 C.F.R. § 1980.104(a).  Upon information and belief, Southern Company managers were aware that the SEC's investigation was triggered by Mr. Wingo's tip to the SEC—a tip it had known Mr. Wingo intended to submit since his September 11, 2014, letter.

102.   Based on its knowledge of Mr. Wingo's protected activity, Southern Company retaliated against Mr. Wingo by subjecting him to retaliatory harassment and threats, forcing him out on paid administrative leave, refusing to reinstate him, terminating him on August 14, 2015, effective February 15, 2016, and filing a public lawsuit against him.

103.   The reasons provided by Southern Company for terminating Mr. Wingo's employment provide direct evidence of the retaliation and violation of

Dodd-Frank.

104.    Southern Company's actions have caused and will continue to cause Mr. Wingo substantial economic loss, including lost salary, bonuses, benefits, and other compensation; damaged his professional reputation; and caused him significant emotional distress and psychological injury.

## COUNT III

## WRONGFUL TERMINATION IN VIOLATION OF MISSISSIPPI PUBLIC POLICY AGAINST DEFENDANTS THE SOUTHERN COMPANY AND SOUTHERN COMPANY SERVICES INC.

105.    Under Mississippi law, an employer may be held liable for wrongful termination in violation of public policy, which occurs when the employee is terminated for his refusal to participate in the employer's illegal activity or reporting the illegal activity of his employer to the employer or anyone else.

106.    Mr. Wingo reported two different illegal activities in which Southern Company engaged, cognizable under Mississippi wrongful discharge law: operation of the combined cycle without proper inspection and licensing, or alternatively, fraudulent obtaining of a license; and Southern Company's fraudulent misrepresentations to the Mississippi Public Service Commission to allow customers to absorb a greater amount of its costs.

107.   On information and belief, Southern Company did not complete and document safety inspections in the combined cycle before it went into operation, meaning that they either operated boiler and pressure vessels without an inspection license or misrepresented the safety inspection status of the combined cycle to state inspection officials of the State of Mississippi.

108.   Southern Company misrepresented to the Commission the Kemper Project's expected Commercial Operations Date ("COD"), falsely claiming after missing the initial promises of a May 2014 COD that it would meet a 2015 COD. Southern Company also falsely claimed that adequate "project controls," including safety processes and safeguards, were in place, which was belied by the failure to conduct adequate safety inspections in the combined cycle.  Defendants further omitted from its submissions and testimony the fact that it would lose another $254 million in tax credits for failing to successfully demonstrate the plant's carbon capture technology by April 2016 which would increase financing costs borne by ratepayers which were not protected by the supposed "cost cap."

109.   Both illegal activities, of which Mr. Wingo warned and reported, are both untrue and constitute a violation of the criminal laws of Mississippi.  Operation of covered boiler and pressure vessels, as described in the Mississippi Code, without a valid inspection license is a misdemeanor.  MISS. CODE § 45-23-51.  False

representations made to the state or a state government entity or official is a felony. MISS. CODE § 97-7-10.   Mail fraud, which includes representations or promises conveyed by mail, telephone, in person, or by other means, for the purpose of securing a business or personal advantage, is a felony.  MISS. CODE § 97-19-83.

110.   In Mr. Wingo's numerous communications to various members of Southern Company management, Mr. Wingo reported the illegal activities or warned of conduct that would likely result in illegal activity.

111.   Southern Company refused to address Mr. Wingo's reports, repeatedly attempting to stop him from continuing to raise his concerns and eventually threatening his career if he persisted.  Southern Company then refused to allow Mr. Wingo to return to work from his paid administrative leave and ultimately terminated him as a result of his reporting, in violation of Mississippi law.

112.   Southern Company's actions have caused and will continue to cause Mr. Wingo substantial economic loss, including lost salary, bonuses, benefits, and other compensation; damage to his professional reputation; and significant emotional distress and psychological injury.

## COUNT IV

**TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONS AGAINST DEFENDANT THE SOUTHERN COMPANY AND DEFENDANT FANNING**

113.    Southern Company and Defendant Fanning had knowledge of Plaintiff's employment with Southern Company Services.[2] Southern Company and Defendant Fanning willfully and intentionally interfered with this relationship by engaging in the conduct described herein to the substantial detriment of Mr. Wingo. Further, Southern Company and Defendant Fanning sought to end Mr. Wingo's employment with Southern Company by harassing him, demoting him, retaliating against him, and ultimately firing him.   Thus, Southern Company Defendants' conduct was calculated to cause damage to Mr. Wingo in his lawful business.

114.    This conduct was committed with the unlawful purpose of causing damage and loss to Mr. Wingo.  This conduct was without right or justifiable cause on the part of the Southern Company Defendants.   Indeed, Southern Company Defendants acted with the intent to harm Mr. Wingo and prevent him from his acting as an honest reporter of misconduct as described herein.

115.    This intentional and willful interference has resulted in extreme business and employment disruption to Mr. Wingo, including the loss of his employment, loss of revenue, damaged reputation, mental anguish, and loss of business goodwill.

---

[2]While Plaintiff has pleaded that he was jointly employed by both Southern Company and Southern Company Services, Plaintiff has also pleaded in the alternative that he was solely employed by Southern Company Services Inc. Further in the alternative, Mr. Wingo has pleaded that he was solely employed by Southern Company.

## **Requested Relief**

WHEREFORE, Mr. Wingo prays this Court for the following relief:

116.    Enter a judgment in Mr. Wingo's favor and against Southern Company Defendants for violations of Mississippi common law, the Dodd-Frank Act, 15 U.S.C. § 78u-6(h) ("Dodd-Frank"), and the Sarbanes-Oxley Act, 18 U.S.C. § 1514A ("SOX");

117.    Award Mr. Wingo two times back pay, including the value of lost benefits, pursuant to 15 U.S.C. § 78u-6(h);

118.    Award Mr. Wingo compensatory damages in an amount to be proven at trial for the economic and non-economic harm that he has experienced as a result of Southern Defendant's unlawful conduct;

119.    Award Mr. Wingo punitive damages in an amount to be proven at trial for the economic and emotional harm that he has experienced as a result of Southern Defendant's unlawful conduct;

120.    Award Mr. Wingo's reasonable attorneys' fees, litigation expenses, and costs; and

121.    Grant such other and further relief as the Court may deem appropriate

## ***Jury Demand***

*Mr. Wingo requests a jury trial on all issues so triable, a right enshrined in the Constitution of the United States of America and of the State of Alabama and preserved by the sacrifices of many.*

_/s/ Stephen D. Heninger_____
Stephen D. Heninger (ASB-5227-e68s)
steve@hgdlawfirm.com
Erik S. Heninger (ASB-1189-k46h)
erik@hgdlawfirm.com
Jeffrey P. Leonard (ASB-2573-J67L)
jleonard@hgdlawfirm.com
**HENINGER GARRISON DAVIS LLC**
2224 1st Avenue North
Birmingham, Alabama 35203
Phone: (205) 326-3336
Fax: (205) 326-3332


*PRO HAC VICE MOTIONS PENDING:*

MICHAEL PATRICK DOYLE
mdoyle@doylelawfirm.com
PATRICK M. DENNIS
pdennis@doylelawfirm.com
JEFFREY I. AVERY
javery@doylelawfirm.com
**DOYLE LLP**
3401 Allen Pkwy Suite 100
Houston, Texas 77019
Phone: (713) 571-1146
Fax:     (713) 571-1148

service@doylelawfirm.com

**Defendant's Address for Service of Summons & Complaint:**

**THE SOUTHERN COMPANY**
c/o CORPORATION SERVICE COMPANY INC
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL 36104

**SOUTHERN COMPANY SERVICES, INC**.
c/o CORPORATION SERVICE COMPANY INC
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL 36104

**THOMAS A. FANNING**
The Southern Company
c/o CORPORATION SERVICE COMPANY INC
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL 36104