# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

BRETT WINGO,         )

     Plaintiff,       )

      )

v.              )         2:17-cv-01328-LSC

      )

THE SOUTHERN      )

COMPANY, et al.,      )

      )

     Defendants.      )

## MEMORANDUM OF OPINION

Before this Court is a Partial Motion to Dismiss, (doc. 30), filed by Defendants The Southern Company ("Southern Company"), Southern Company Services, Inc. ("SCS"), and Thomas A. Fanning ("Fanning") (collectively, "Defendants"). In their Motion, Defendants argue that certain claims in Plaintiff's Complaint should be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted. As stated more fully below, Defendants' Partial Motion is due to be GRANTED in PART and DENIED in PART.

## I. FACTS AND PROCEDURAL BACKGROUND[1]

---

[1] In evaluating a motion to dismiss, this Court "accept[s] the allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiff." *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012).

In 2010 Southern Company and one of its subsidiaries, Mississippi Power Company, began construction of a "clean coal" power plant in Kemper, Mississippi (the "Kemper Project"). The Kemper Project was ultimately intended to convert coal into synthetic gas, which would then be fed into a combustion turbine in order to create electricity. Defendants intended to achieve the Kemper Project commercial operations date ("COD") by May 2014 in order to take advantage of substantial federal tax credits and other financial incentives contingent on the timely completion of the Kemper Project.

In August 2011, Southern Company promoted Plaintiff to be a Project Manager at the Kemper Project, where he was responsible for the plaint's coal gasification and gas cleanup systems. For three consecutive years, Plaintiff received positive performance review and prestigious Southern Company awards.

In June 2013, Southern Company employees were asked to participate in a "cultural survey" to root out complacency and encourage persons to step forward to report safety or ethical violations without fear of retaliation. The cultural survey was apparently put in place following two public incidents that were disfavorable to Defendants' public image: (1) an explosion at another of Defendants' power plants caused by a failure to follow safety procedures, and (2) a recalled and amended SEC filing where Southern Company was forced to admit "material weaknesses"

in controls over financial reporting at Mississippi Power on the Kemper Project. Plaintiff was selected by his supervisor Tim Pinkston ("Pinkston") to participate in the cultural survey.

During a June 20, 2013 interview as part of the cultural survey, Plaintiff reported to Southern Company representatives that he believed the May 2014 COD was not achievable. Plaintiff told the representatives that he was concerned about the Southern Company's reporting of the May 2014 COD because the allegedly unachievable date would mislead shareholders. Plaintiff also feared that in a rush to comply with the May 2014 COD, the Southern Company would take safety shortcuts that could potentially harm its employees. Southern Company representatives were initially receptive to this information and directed Plaintiff to create and supervise a new "resource loaded schedule" ("RLS") in which the various components of construction and testing are brought together to ensure proper match-up with initial plans. Plaintiff was to complete the first RLS by mid-September 2013.

After completing the first RLS in early September, Plaintiff informed his supervisor at the time, Joe Miller ("Miller"), that based on Plaintiff's experience he believed the Kemper Project COD would run into the fourth quarter of 2014, if not into 2015. This assessment was buttressed by a Quantitative Risk Assessment

("QRA")'s finding conducted by Southern Company's outside auditor PwC. The QRA uses statistical analysis of thousands of individual tasks performed in the Kemper Project to attempt to predict a COD. The January 2014 QRA, which relied in part on Plaintiff's RLS, reported a high probability that the COD would occur later than 2015.

Despite Plaintiff's RLS and PwC's QRA, both of which predicted the Kemper Project COD occurring in 2015, Southern Company management manipulated Plaintiff's RLS to claim that a 2014 COD was still achievable. Because governmental and private incentives for the project of almost half a billion dollars were contingent on a 2014 COD, Plaintiff alleges that Southern Company management continued to repress Plaintiff's conclusions and pressure employees to take dangerous shortcuts that affected the viability of the Kemper Project.

Plaintiff sought to escalate his concerns about the viability of the 2014 COD and his manager's manipulation of Plaintiff's RLS to upper level managers. Following a meeting between engineers and Mississippi Power Company Vice President John Huggins ("Huggins") where Huggins emphasized meeting the 2014 COD, Plaintiff informed Huggins that he believed certain managers had manipulated Plaintiff's information to justify the viability of a 2014 COD. Huggins appeared to brush off Plaintiff's concerns, and Plaintiff reiterated these concerns in

an email a day later. Huggins did not respond to the email, but called Plaintiff days later to berate him for putting the concerns in writing and told him to meet in person to discuss the issue.

On March 6, 2014, Plaintiff met with Huggins and another vice president overseeing the Kemper Project to again inform them of the issues surrounding the 2014 COD. Huggins and the vice president both represented that they would take corrective action, such as retracting the QRA, and generally told Plaintiff that his concerns were too great for the problem at hand.

Out of fear that Huggins and other senior management were involved in promulgating the fraudulent QRA, Plaintiff decided that he should inform Defendant Fanning, who was and continues to be the CEO of Southern Company. On March 10, 2014, Plaintiff called Fanning and detailed management's alleged manipulation of his RLS and the 2014 QRA to produce a false 2014 COD. He informed Fanning that he had raised these issues with other upper-level management, but no corrective action had been taken. Plaintiff also stated his fears that Fanning could be personally liable for misrepresenting the COD to stockholders. Fanning assured Plaintiff that Plaintiff had "done the right thing" and that Fanning would ensure that the problem was dealt with.

Following this meeting, Plaintiff alleges that Southern Company managers began to retaliate against him for his whistleblowing activities. On March 13, 2014, Plaintiff was excluded from a meeting among Southern Company managers to address future QRA projections. On April 2, 2014, Plaintiff was instructed by Senior Project Manager Brett Wingard to relinquish Plaintiff's scheduling responsibilities, supposedly because Plaintiff's help was needed in location instrument air stations. According to Plaintiff, this reassignment was a low-level task and a clear demotion. On May 13, Plaintiff handed over his scheduling responsibilities to Miller. Plaintiff urged Miller to keep the schedule "real." Miller replied that if he did that, he would be out of a job.

Plaintiff continued to report safety violations he observed to Southern Company managers, even as he was marginalized and assigned to non-managerial tasks. Other employees provided Plaintiff with reports and photographs of unsafe conditions at the plant, such as improperly installed piping and valves which could allow a dangerous release of high-pressure steam. Plaintiff reported those violations as well, and management reacted by ignoring these obvious dangers and warning Plaintiff that he was risking his position at the Southern Company.

On August 29, 2014, Plaintiff requested a two-week vacation. Southern Company management instead placed Plaintiff on forced administrative leave.

Before being escorted from his worksite, Plaintiff was instructed to turn over his access card and collect his personal effects. In October, 2014, Plaintiff submitted a Form Tip, Complaint, or Referral ("TCR") to the SEC, alleging that the Southern Company had engaged in fraudulent, material acts and practices in violation of Rule 10b-5 by misrepresenting the construction schedule and construction milestones to regulators and investors. Plaintiff was eventually told by Southern Company management in December 2014 that he would not be returning to work, although Plaintiff alleges that he was not actually terminated until February 2016.

Plaintiff filed his first Sarbanes-Oxley Act ("SOX") retaliation complaint with the United States Department of Labor Occupational Safety and Health Administration ("OSHA") on February 15, 2015 (the "First Complaint"). Two days later, Plaintiff supplemented the original retaliation complaint with an additional, shorter document (the "Supplemental Complaint"). Defendants were informed of Plaintiff's charges against them later in February 2015, although according to Defendants they only received the Supplemental Complaint, but did not receive the First Complaint until a year later. Plaintiff instituted this action on August 8, 2017.

## II. STANDARD OF REVIEW

The Eleventh Circuit has not spoken directly on whether a plaintiff's failure to exhaust administrative remedies under 18 U.S.C. § 1514A should be addressed according to Federal Rule of Civil Procedure 12(b)(6) or 12(b)(1). "That motions to dismiss for failure to exhaust are not expressly mentioned in Rule 12(b) is not unusual or problematic." *Bryant v. Rich*, 530 F.3d 1368, 1375 (11th Cir. 2008). "Federal courts . . . traditionally have entertained certain pre-answer motions that are not expressly provided for by the rules." *Id.* (quoting *Ritza v. Int'l Longshoremen's & Warehousemen's Union*, 837 F.2d 365, 368–69 (9th Cir. 1988)). However, *Bryant* made clear that "[b]ecause exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits, an exhaustion defense . . . is not ordinarily the proper subject for a summary judgment; instead, it should be raised in a motion to dismiss, or treated as such if raised in a motion for summary judgment." *Id.* at 1375–76 (quotation marks omitted). Because exhaustion of nonjudicial remedies is "similar to motions regarding jurisdiction and venue" they should be treated as a matter in abatement." *Tillery v. U.S. Dep't of Homeland Sec.*, 402 F. App'x 421, 424 (11th Cir. 2010). In those types of Rule 12(b) motions, "it is proper for a judge to consider facts outside of the pleadings and to resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity

to develop a record." *Bryant*, 530 F.3d at 1376 (footnotes omitted). Alternatively, in the 12(b)(6) context, the Court may "consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)). In this context, "undisputed" means that the authenticity of the document is not challenged. *Id.* Both Plaintiff and Defendants rely on the attached First and Supplemental Complaints Plaintiff submitted to OSHA. (Docs. 31-1 – 31-7.). The First and Supplemental Complaints are central to Plaintiff's SOX exhaustion claims, and neither party challenges their authenticity.

In regards to Plaintiff's tortious interference claim, which Defendants argue is subject to dismissal under Federal Rule of Civil Procedure 12(b)(6), a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, in order to withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint "must plead enough facts to state a claim to relief that is plausible on its face." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347–48 (11th Cir. 2016) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Stated another way, the factual allegations in the complaint must be sufficient to "raise a right to relief above the speculative level." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (quotation omitted). A complaint that "succeeds in identifying facts that are suggestive enough to render [the necessary elements of a claim] plausible" will survive a motion to dismiss. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted).

In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. 679. This Court then "assume[s] the[] veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief. *Id.* Review of the complaint is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense." *Id.* If the pleading "contain[s] enough information regarding the material elements of a cause of action to support recovery under some 'viable legal theory,'" it satisfies the notice pleading standard. *Am. Fed'n of Labor & Cong. of Indus. Orgs v. City of Miami*, 637 F.3d 1178,

1186 (11th Cir. 2011) (quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683–84 (11th Cir. 2001)).

### III.    DISCUSSION

#### a. ADMINISTRATIVE EXHAUSTION

Section 806 of SOX provides "whistleblower" protection to employees of publicly traded companies. Under this provision, a public company (or agent of a public company) may not discriminate against any employee who "provide[s] information, cause[s] information to be provided, or otherwise assist[s] in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of . . . , any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by . . . a Federal regulatory or law enforcement agency . . . ." 18 U.S.C. § 1514A(a)(1).

Before an employee can assert a cause of action in federal court under Section 806 of SOX, that employee must first file a written complaint with OSHA and allow OSHA to resolve the employee's claims administratively. *Id.* § 1514A(b)(1)(A). The administrative complaint must be filed "[w]ithin 180 days after an alleged violation of the Act occurs," 29 C.F.R. § 1980.103(d), but "[n]o

particular form of complaint is required." *Id.* § 1980.103(b). If the employee has met these requirements for a particular violation, and a final administrative decision has not issued within 180 days of the filing, the employee can proceed with an action in federal court based on that violation. 18 U.S.C. § 1514A(b)(1)(B).

If an employee has not exhausted their claims administratively, a court may not hear those claims. The purpose of an administrative charge with OSHA "is to trigger the agency's defined investigation and conciliation procedures." *Wallace v. Tesoro Corp.*, 796 F.3d 468, 476 (5th Cir. 2015) (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)). In the absence of greater clarification by § 1980.103 of what information an administrative complaint must contain, the Fourth and Fifth Circuits have ultimately shaped the requirements for the contents of whistleblower's complaint according to its purpose within the administrative scheme.

When faced with the exhaustion requirements for a whistleblower complaint under SOX, *Wallace* determined the bounds of the administrative exhaustion requirement by reference to the similar requirements of Title VII's exhaustion requirements. 496 F.3d at 476-77. Because a complaint's purpose is to initiate an agency's focused investigation, "allow[ing] plaintiffs to sue on claims that the agency never had the chance to investigate and attempt to resolve" would

undermine OSHA's statutory mandate and authority. *Id.* at 476. On the other hand, "the exhaustion requirement should go only as far as is necessary to give the agency its initial crack at the case." *Id.* The scope of the resulting action may extend past the "four corners" of the administrative complaint to "the extent of the investigation that the agency complaint can reasonably be expected to spawn." *Id.*; *Jones v. Southpeak Interactive Corp.*, 777 F.3d 658, 669 (4th Cir. 2015) ("[L]itigation may encompass claims reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint." (quotation marks and citation omitted)).

The Eleventh Circuit has not spoken directly on the requirements for the contents of an administrative complaint sufficient to comply with § 1514A's exhaustion requirements. It has, however, spoken on the analogous Title VII exhaustion requirements, and adopted a similar rule to above in relation to EEOC exhaustion that a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Georgia Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (quoting *Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000). Given similarity of purpose between SOX and Title VII, and the agreement of the Courts of Appeal to reach the issue of the scope of exhaustion of an SOX

administrative complaint, the Court finds that the proper inquiry is whether Plaintiff's claims "can reasonably be expected to grow out of the charge" contained in their otherwise compliant administrative complaint.

Defendants cite *Bozeman v. Per-Se Techs., Inc.*, 456 F. Supp. 2d 1282, 1356 (N.D. Ga. 2006) and Order, *Hanna v. WCI Communities, Inc.*, CASE NO. 04-80595-CV-HURLEY/LYNCH (S.D. Fla. Nov. 15, 2004) (hereinafter "*Hanna*") for the proposition that Plaintiff's failure to name Defendant Fanning in the caption of his administrative complaint constitutes a *per se* failure to exhaust. After review of those decisions, the Court respectfully departs from *Bozeman* and *Hanna*'s overly formulaic exhaustion requirements. Both decisions hold that the plaintiff had not exhausted administrative remedies, apparently because the complainant did not name the defendant in the heading of the administrative complaint as a "party" but only mentioned the defendant in the body of the complaint. *Bozeman*, 456 F. Supp. 2d at 1357-58; *Hanna*, at 4-5. Neither of these decisions is particularly persuasive as they are based on a former, more stringent version of § 1980.103(b). *Cf. Hanna*, at 4 ("The administrative complaint must be filed 'within 90 days after an alleged violation of the Act occurs' and include a full statement of the acts and omissions, with pertinent dates, which are believed to constitute the violations." (citing 29 C.F.R. § 1980.103(b)(2002)) *with* 29 C.F.R.

§ 1980.103(b) (2015) ("Nature of filing. No particular form of complaint is required.").

Defendants' reading of *Bozeman* and *Hanna* is discordant with the purpose of the exhaustion requirement, which is to put OSHA on notice of possible SOX violations. The Court has been unable to find any law or regulation requiring the complainant to include a caption of which defendants are to be sued, and pulling such a requirement out of thin air directly contradicts the current version of § 1980.103(b), which states that "no particular form of a complaint is required." The Court cannot invent formalistic requirements and then fault the complainant, who in this case drafted the administrative complaint without counsel, for failing to follow them.

The Court thus must determine whether the counts asserted under SOX in Plaintiff's Complaint "can reasonably be expected to grow out of the charge" contained in the two filings that constitute Plaintiff's administrative complaint. Plaintiff's First Complaint was deemed filed on February 15, 2015, and by Plaintiff's own admission is "confusing" and "poorly communicates" his charges. (Doc. 31-6 at 6.) In the First Complaint, Plaintiff identifies over sixty individuals or entities that either violated SOX, retaliated against Plaintiff for his whistleblowing activities, or were potential witnesses to these violations. Defendant Fanning is

identified in the First Complaint among other actors in a list where Plaintiff uses certain acronyms to indicate what violations of federal law he believes the individual is liable for. Plaintiff states in reference to Defendant Fanning:

> These are the INDIVIDUALS who should be held accountable for breaking the law (including securities laws, retaliation laws and/or OSHA laws) . . . and/or at least reprimanded for staying silent when there was a duty to act. I also list some people who are not accused (by me) of anything other than being witnesses caught up in a culture of fear like me.
>
> I've categorized each individual as follows:
>
> . . .
>
> SOX = I believe we can prove they were Complicit of Perpetrating SEC/SOX violations
>
> . . .
>
> RETALIATION = I believe this person had a role in retaliation that would rise to criminal
>
> . . .
>
> Tom Fanning (CEO of Southern Company) SOX/RETALIATION –I talked with Fanning for 21 minutes on March 10th 2014 explaining, in detail, the problems going on in Kemper, that the project had been hijacked by an inner circle of friends and that 2014 COD was not possible and that I was worried about him signing any financials based on the current schedule. I gave him details and I named names. He never followed back up with me, never thanked me afterwards and has not intervened on my behalf to prevent my ouster from the company since.

(Doc. 31-1 at 6-7, 31-2 at 1.)

Plaintiff supplemented his First Complaint with the Supplemental Complaint two days later on February 17, 2015 wherein Plaintiff sought to "distill" his thirty-four page complaint down to "its essence" in order to "have a more efficient administrative review process." (Doc. 31-6 at 5.) In the Supplemental Complaint, Plaintiff makes no reference to Defendant Fanning at all, nor Plaintiff's March 10, 2014 meeting with the executive. Instead, Plaintiff generally talks about retaliatory acts that occurred much later and involved different actors. Importantly for this Court's inquiry, Plaintiff directed the recipient of the Supplemental Complaint to "[i]gnore (for now) all the events that lead up to September 23rd, 2014" because "[t]he final events are all one really need consider when determini[n]g the merits of a retaliation claim." (*Id.* at 6.)

Accordingly, the Court must determine whether the claims against Defendant Fanning "can reasonably be expected to grow out of the charges" found in the First and Supplemental Complaints. Here, OSHA administrators cannot be said to reasonably seek to investigate Defendant Fanning for SOX violations or retaliation based on the reading of the two documents. While Plaintiff certainly mentioned Defendant Fanning's acts or omissions in the First Complaint, they were spread among many other actors and were not conspicuously indicated in comparison to other individuals. Plaintiff's Supplemental Complaint likewise

instructed OSHA to focus on later events that apparently did not involve Defendant Fanning. Reading the two documents together, the Court cannot believe that OSHA would properly seek to investigate Defendant Fanning more than the other sixty individuals named—and it is certainly indisputable that Plaintiff has not *exhausted* administrative remedies against all individuals named in the first complaint. Rather, the Court finds that the specific acts or omissions in the Supplemental Complaint, read in reference to the First Complaint, should properly define the scope of administrative exhaustion. Thus, Defendants' Motion to Dismiss should be granted to the extent that it argues that Plaintiff has failed to complete the prerequisite administrative exhaustion against Defendant Fanning.

### b. TORTIOUS INTERFERENCE

Defendants additionally argue that Plaintiff's claim of tortious interference with an existing business relationship against Defendant Fanning should be dismissed because the applicable statute of limitations has run, and Defendant Fanning was not a stranger to Plaintiff's employment contract. Defendants argue that Alabama law should apply to this state-law claim. Plaintiff argues the claim is properly governed by Mississippi law, which both allows for a longer statute of limitations and creates an exception to the stranger-to-a-relationship requirement where a plaintiff alleges the tortfeasor was an agent to one of the parties and acted

with malice. *Vaughan v. Carlock Nissan of Tupelo, Inc.*, 553 F. App'x 438, 444 (5th Cir. 2014) (citing *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985)); *see also Morrison v. Miss. Enter. for Tech., Inc.*, 798 So.2d 567, 575 (Miss. App. 2001). In order to resolve this dispute, then, the Court must determine whether Alabama or Mississippi law applies.

"Federal courts hearing state law claims under diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law." *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1260 (11th Cir. 2015) (quoting *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014)). "Alabama law follows the traditional conflict-of-law principles of . . . *lex loci delicti*. . . . Under the principle of *lex loci delicti*, an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred." *Precision Gear Co. v. Cont'l Motors, Inc.*, 135 So. 3d 953, 956 (Ala. 2013) (quoting *Lifestar Response of Alabama, Inc. v. Admiral Ins. Co.*, 17 So.3d 200, 213 (Ala. 2009)). Regardless of whether a tort claim arose from a business relationship, it is still treated as a tort claim for purposes of Alabama's conflict-of-law precedent. *Batey & Sanders, Inc. v. Dodd*, 755 So. 2d 581, 583 (Ala. Civ. App. 1999).

Plaintiff's tortious interference claim is based on the actions by Defendants leading up to and including the termination of his employment. The parties dispute where those actions occurred, often taking different inferences from the same allegations in Plaintiff's Complaint to do so. A review of these allegations shows that Plaintiff was a resident of the State of Alabama, but that he worked extensively on the Kemper Project in Mississippi. (Doc. 1 ¶ 11.) Plaintiff has pled in the alternative that he was employed by either the Southern Company, incorporated under the laws of Delaware with its headquarters in Atlanta, or SCS which is incorporated and based in Alabama. The Complaint is silent on Plaintiff's location when he was terminated. (*Id.* at ¶ 90.) Defendants argue that Plaintiff was home on administrative leave when he was informed that his employment was to be terminated. Plaintiff disputes this conclusion, and states that he was actually terminated in Mississippi.

Defendants acknowledge in their reply that "district courts commonly reserve conflict of law questions for summary judgment." (Doc. 34 at 6.) Quixotically, Defendants then quibble with Plaintiff about facts outside the

Complaint to establish that Plaintiff's firing actually occurred in Alabama, and not Mississippi.[2] The issue is not as simple as where Plaintiff learned that he was fired:

> It is true, on the one hand, that the state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law. But it is equally true that the state where the injury occurred may have little actual significance for the cause of action, and that other factors may combine to outweigh the place of injury as a controlling consideration. Conflict-of-laws questions thus cannot be resolved by reciting general pronouncements; to determine which sovereign has the most significant relationship to a particular issue, a court must instead examine the facts and circumstances presented in each particular case.

*Judge v. American Motors Corp.*, 908 F.2d 1565, 1568 (11th Cir. 1990) (citations and quotation marks omitted). The Court does not have before it the "facts and circumstances" needed to decide this complex choice-of-law issue. It is unclear from the complaint where Plaintiff was fired, where Plaintiff worked before and during the facts that occurred on the Kemper Project, and other facts necessary to make a choice-of-law holding. Given the fact-intensive inquiry required to determine whether Alabama or Mississippi law applies, a choice-of-law analysis would be better reserved for summary judgment, where the Court would have the benefit of a proper and more-thoroughly developed record. *AXA Pac. Ins. Co. v. Piper Aircraft Corp. Irrevocable Tr.*, No. 15-24792-CV, 2017 WL 1439936, at *1 (S.D.

---

[2] Defendants cite Plaintiff's administrative complaint to OSHA for the proposition that he was terminated in Alabama because Plaintiff listed his mailing address in Homewood, Alabama. Whether Plaintiff resided in Alabama at the time of the First Complaint's filing is not dispositive of where Plaintiff was fired. (Doc. 31-5 at 32.)

Fla. Jan. 25, 2017). Indeed, the Court instructed the parties during the January 4, 2018 discovery hearing that unless the motion to dismiss made an actual difference to discovery *and* could properly be dealt with at the motion-to-dismiss stage, that the Court would determine the issue at summary judgment. (Doc. 52 at 73-75.) Given the dearth of factual disputes concerning the apparent choice-of-law issue, the Court declines to decide the merits of this dispute until summary judgment.

Defendants argue that Plaintiff's tortious interference claim should be dismissed even under Mississippi law for the Plaintiff's failure to plead bad faith. They rightly point out that these allegations largely are legal conclusions without operative fact. (*See* Doc. 1 ¶ 113.) Plaintiff has likewise asked for leave to amend his complaint in the event that the Court finds that Plaintiff did actually fail to plead bad faith, although Plaintiff also argues that his current pleadings are sufficient. Plaintiff has leave within ten (10) days of the entry of this Memorandum of Opinion to file an Amended Complaint to better articulate the basis for Defendants' bad faith in regards to Plaintiff's tortious interference claim.

## IV.    CONCLUSION

For the reasons stated above, Defendants' Partial Motion to Dismiss is due to be GRANTED in Part and DENIED in PART. An Order consistent with this Memorandum of Opinion will be entered separately.

**DONE** AND **ORDERED** ON MAY 29, 2018.

_____

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

190485